Karra J. Porter, Utah Bar No. 5223
karra.porter@chrisjen.com
Phillip E. Lowry, Utah Bar No. 6603
phillip.lowry@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
15 West South Temple, Suite 800
Salt Lake City, Utah 84101
Telephone: (801) 323-5000
Attorneys for Plaintiff

**SEALED**

FILED
U.S. DISTRICT COURT

2015 JAN 15 A 11: 42

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DIVISION, STATE OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Mignonne McDaniel,<br><br>    Plaintiffs,<br><br>vs.<br><br>UNIVERSITY OF UTAH HOSPITAL AND CLINICS, ATRIAL FIBRILLATION AND CARDIAC ELECTROPHYSIOLOGY LABORATORIES, DEPARTMENT OF CARIDOLOGY; DR. NASSIR MARROUCHE; DONALD ZARKOU; AND JEREMY MICHAEL FOTHERINGHAM,<br><br>    Defendants. | **FALSE CLAIMS ACT COMPLAINT AND JURY DEMAND**<br><br>\*\*\*<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>DO NOT PLACE IN PRESS BOX<br>DO NOT ENTER ON PACER<br>\*\*\*<br><br>`Case: 2:15cv00031`<br>`Assigned To : Benson, Dee`<br>`Assign. Date : 1/15/2015`<br>`Description: Sealed v Sealed` |

Plaintiffs, by and through counsel, complain and allege against defendants as follows:

## INTRODUCTION

For more than six years, the defendants have billed, and paid by, Medicare and Medicaid for

medical treatment and services that have not been performed by a properly certified specialist (a

cardiac electrophysiologist).    The institutional defendants responsible for this fraud are the University of Utah Hospital and Clinics, through the activities of the Atrial Fibrillation and Cardiac Electrophysiology Laboratories, Department of Cardiology, at the University of Utah Health Science Center ("EP Lab"), in conjunction with the Comprehensive Arrythmia Research and Management Center ("CARMA")(a research arm of the clinics).    Doctors and staff who work within CARMA are employed by the University of Utah Hospital and Clinics.    The activities identified in this Complaint originated and continued exclusively within the EP Lab, with CARMA gathering research data from the treatments. The University of Utah Hospital and Clinics is ultimately responsible for the conduct alleged herein. Doctors in the EP Lab and CARMA have received and accepted patient referrals from other health care providers for consultation, or have initiated referral to their own facility.    These patients require a variety of cardiac treatments through electric charges or currents administered by catheter.    The skills required to administer this treatment are taught at the EP Lab to Electrophysiology Fellows, who are typically certified cardiologists seeking subspecialty training in electrophysiology treatment.

Patients who received electrophysiology treatment from EP Lab physicians suffer from cardiac conditions that can be serious or even life-threatening. Referring providers are seeking specialized consultation, diagnosis and treatment plans from the EP Lab.  Treatment in the EP Lab requires the direct supervision by a trained electrophysiologist, who oversees treatment and provides guidance to fellows. A patient is deemed as being treated by that electrophysiologist, not by the fellow, and when coded and billed the procedure is deemed a treatment by the electrophysiologist. Exclusive attention and physical presence of the electrophysiologist is required during the treatment.

Dr. Nassir Marrouche was charged during the period alleged herein to be a treating and attending physician in the EP Lab, and to train fellows in electrophysiology treatment. On a widespread basis, Dr. Marrouche was either not physically present or not directly supervising fellows conducting electrophysiology treatments in the EP Lab. On numerous occasions this resulted in substandard treatment, to include damaging or burning of the patient's heart.

The defendants have billed Medicare, and in some instances Medicaid, for the electrophysiology treatments, which, under Current Procedural Terminology (CPT) billing codes require supervision and participation by a trained electrophysiologist. Nonetheless, the defendants billed, and were paid by, Medicare and Medicaid for treatments that were not in fact properly provided. Dr. Marrouche was often absent from the EP Lab during treatment of patients for which he was the attending physician, or would cause to be treated in the EP Lab multiple patients at the same time. This constituted double billing, billing for services not rendered, or both. This in turn constituted a fraud on Medicare and Medicaid, impairing not only the financial integrity of the program, but also the physical and emotional well-being of patients who are dependent upon the services being performed by the EP Lab.

## I. JURISDICTION AND VENUE

1.     This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims, transactions and other related acts of defendants, and is brought pursuant to Title 31 U.S.C. §§3729-3733, more popularly known as the False Claims Act, through Mignonne McDaniel (hereinafter referred to as "Relator"), pursuant to 31 U.S.C. §3730(b) and 42 USC §1395nn, for and on behalf of the United States of America.

3

2.     Jurisdiction of the Court is founded upon 28 U.S.C. §§1331 and 1345.  The claims set forth herein arise under and are founded upon federal law.

3.     Personal jurisdiction over the defendant is proper in this Court pursuant to 31 U.S.C. §3732(a), which provides that any action under 31 U.S.C. §3730 may be brought in any district in which the defendants can be found, reside, transact business, or in which any act proscribed by 31 U.S.C. §3729 occurred.

4.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(b).  Defendant EP Lab is found in, does business in, and made and continues to make false claims within this District, and within the State of Utah, including a substantial part of the events and omissions giving rise to the claims set forth herein.

## II. PARTIES

5.     Relator Mignonne McDaniel ("McDaniel") is an individual residing in Salt Lake County, State of Utah, and was an employee of the defendant from September 15, 2008 to September 30, 2010.  McDaniel worked as a catheter lab recovery nurse, or holding room nurse, recovering EP Lab patients, and assisting physicians and patients.

6.     McDaniel left her employment with the University of Utah Hospital and Clinics to work in a new position.

7.     Defendant EP Lab is part of the University of Utah Hospital and Clinics, owned and operated by the State of Utah.  At all times the EP Lab acted through its officials, agents and employees, as identified herein.

8.      Defendant Dr. Nassir Marrouche was, at all relevant times, an individual employed by and/or working at or with the EP Lab, who personally participated in the actions and practices alleged herein.  Said defendant is a resident of the State of Utah.

9.      Defendant Jeremy Fotheringham was a director of the EP Lab during Relator's tenure there.  He has since been terminated for misconduct relating to retaliation concerning sexual harassment claims, which termination resulted from an internal investigation conducted by the University of Utah.

10.     Defendant Donald Zarkou was a director of the EP Lab during Relator's tenure there.  Zarkou continues to be a director for the Division of Cardiology.

11.     At all relevant times, Relator McDaniel was a person who handled various patient charts/files in the EP Labs, and either participated in or was directly aware of the procedures from which arose the coding and billing practices of the EP Lab.  Relator McDaniel was responsible for making entries in and otherwise reviewing patient charts during post procedure care.  These charts reflected Medicare and Medicaid billing.  She also was a direct witness of patient treatment, to include attendance by Dr. Marrouche and participation in treatment by fellows of the lab.

12.     The EP Lab provides specialized consultation for patients that have particular cardiac conditions deemed susceptible to electrophysiology treatment. Many of the conditions are life-threatening if not properly treated.  The EP Lab accepts consultation referrals from treating physicians and other health care providers who are unable to treat these unique maladies.  The EP Lab is highly specialized in the area of particular cardiac conditions and anomalies that are susceptible to and potentially responsive to relatively noninvasive electrophysiology treatment.

## III.    GENERAL ALLEGATIONS

13.    McDaniel became employed with the EP Lab on September 15, 2008.  Her job responsibilities included accepting patients, taking patient histories, starting IVs, obtaining labs, arranging for EKGs, surgical preparation, sending patients to the proper labs, receiving patients and recovering patients.  These duties included preparing and reviewing patient charts.   They also included reporting to the attending physician objective patient conditions.

14.    The consultation services and process, when done appropriately, would generally proceed as follows:

a.    Typically, health care providers, such as doctors and hospitals, would make a referral to attending electrophysiologists in the EP Lab.  The majority of these referrals were to Dr. Marrouche.  Referred patients had unusual cardiac maladies amenable to the relatively noninvasive option of EP treatment for consultation regarding diagnosis and treatment plans, and, if appropriate, eventual treatment. The primary purpose of consulting with Dr. Marrouche was to secure treatment in the EP lab by a Physician certified as an Electrophysiologist.

b.    Once a referral to the EP Lab was made, either the patient or health care provider would contact the EP Lab to make an appointment for the patient.

c.    In preparation for the actual examination by the EP physician, the patient's prior medical records would be gathered and the patient would provide answers to physician inquiries.  These records and information would then be put into a medical file, which was referred to as the "chart."  This was prepared for the EP

treating physician in advance of the appointment, and would be supplemented during treatment in the EP Lab.

d.     Before the actual appointment, a trained EP physician would review the chart in preparation for the patient's exam, and also review the chart with fellows. This was a training opportunity for the fellows.

e.     At the beginning of a patient's visit to the EP Lab, an intake nurse would meet with the patient to complete various forms and obtain needed information. A nurse assistant would then obtain the patient's vitals and document the information in the chart.

f.     The supervising doctor and at least one fellow would then typically meet with the patient and perform an examination. The examination would be noted in the chart. The patient would then be sedated, and a catheter with an electric instrument would be inserted into the femoral artery in the groin and then traced up to the heart. Electric current would then be placed into the catheter head under precise guidelines and with the guidance of instruments and imaging. The electricity was manipulated in such a way as to assist heal cardiac damage or create tissue conditions to ablate deleterious conditions. The entire procedure could take anywhere from 4-8 hours, and was required to be supervised by a certified electrophysiologist. Fellows would participate in treatment with the certified electrophysiologist's direct supervision. At the conclusion of the treatment the supervising electrophysiologist would either physically sign the written report or provide an electronic signature as part of the approval process.

g.      In every instance where treatment occurred, those patients whose treatment was paid by Medicare or Medicaid would receive prior authorization for treatment from Medicare or Medicaid.   At the conclusion of the treatment the procedure would be billed to Medicare or Medicaid under a CPT ("Current Procedural Terminology") code that reflected EP treatment under direct supervision of a certified electrophysiologist. Those CPT codes were 93600 through 93662.

h.      In those cases where additional tests or procedures needed to be performed as part of the patient's treatment, a member of the EP Lab staff, would follow up with Medicare or Medicaid in order to obtain the necessary authorizations.  Again, such testing or treatment required direct supervision and approval by a certified electrophysiologist.

i.      After completion of treatment the patient would be placed in a recovery area until deemed stable enough to depart.  McDaniel was charged with supervising the patients during this time.

15.     The heart catheterization procedures that the EP Lab conducted were extremely sensitive and risky.  While the fellows were trained cardiologists, they were not qualified to conduct EP procedures without supervision.  They were working in the EP Lab to receive specialized EP training.  That training was required for them to be able to conduct EP procedures, and, as part of their training, the fellows required specialist supervision.

16.     The CPT codes under which the EP procedures were billed required that an EP specialist be the attending physician and directly supervise the fellows in the treatment.  The EP specialist could not delegate to a fellow the treatment.  Fellows were not qualified to conduct the

treatment unsupervised, and the procedure could not be billed as an EP treatment to Medicare or Medicaid unless the EP specialist was the present attending physician.

17.     Despite the extreme importance attached to specialist supervision, and the expectation that such specialists, including Dr. Marrouche, supervise all aspects of EP procedures, Dr. Marrouche was often absent during EP treatments. Fellows would seek him out and he would not respond, either because he was not in the clinic, or was unavailable because he was treating a different patient simultaneously in another EP Lab.

18.     Notwithstanding Dr. Marrouche's absence, fellows and other staff members in the EP Lab were compelled to chart Dr. Marrouche's presence at procedures. Dr. Marrouche, Mr. Zarkou and Mr. Fotheringham were in positions of authority over the fellows, and it was within their power to influence, hinder and even prevent a fellow's successful completion of the fellowship. In fear of this power, the fellows and other staff would chart Dr. Marrouche's presence at procedures he did not attend. Moreover, CPT codes reflecting Dr. Marrouche's supervisory or direct participation were used to generate Medicare and Medicaid billings. Dr. Marrouche, Mr. Zarkou and Mr. Fotheringham were either aware of the issuance of these billings, were deliberately ignorant of the billings, and/or recklessly disregarded the issuance of such billings.

19.     Donald Zarkou and Jeremy Michael Fotheringham acted as directors of the EP Lab. They were often present in the control rooms of the EP Labs when procedures were conducted under the ostensible supervision of Dr. Marrouche, when Dr. Marrouche was actually not present. Zarkou and Fotheringham were aware that both charting and billing of Dr. Marrouche's presence was occurring when he in fact was not present and was not supervising EP treatments.

20.     McDaniel was directly aware of these misrepresentations through her own observations.   She was also indirectly aware of them through representations made by other staff members at the EP Lab who indicated that mischarting and misbillling was occurring.

21.     McDaniel heard from staff members that the misrepresentations had been occurring before she began employment.   She also observed that the staff seemed to accept these misrepresentations, either acceptingly, resignedly, or grudgingly (depending on the staff member), as business as usual.  This reinforced the notion that the conduct predated her employment for some time.

22.     Dr. Marrouche, Zarkou and Fotheringham were motivated to make misrepresentations regarding Dr. Marrouche's presence because the misrepresentations directly resulted in increased perceived productivity for the EP Lab, which generated more revenue for the lab.  In essence, Dr. Marrouche was double billing by delegating to fellows procedures that required his direct supervision.   Whether Dr. Marrouche was absent or was supervising more than one treatment at a time, he was creating a fiction where he could be in two places at the same time.

23.     Dr. Marrouche was to be the attending physician, and was to train and teach the fellows.  The EP Lab did not have a policy in place reflecting this requirement, but should have. Zarkou and Fotheringham failed and refused to implement such a policy because it would have undermined an otherwise profitable practice of relying on untrained cardiologists to conduct EP procedures.

24.     Dr. Marrouche, as a physician, should have served as the attending despite the EP Lab's lack of policy.

25.     On multiple occasions the defendants' fraudulent conduct resulted in patient injury, including at least two instances where a catheter burned through the heart wall of a patient.  One of those instances involved treatment by Dr. Saul Kalvaitis.  The other involved Dr. Gaston Vergara. In both of those instances Dr. Marrouche was not physically present in the clinic and was not discharging his duties as an attending physician.

26.     Medicare and Medicaid CPT billing codes, either expressly or implicitly, required the supervising physician to be attending the relevant procedures described by the codes.  Moreover, by generating the relevant CPT codes, the supervising physician, either directly or through the duly appointed staff, was certifying to the United States that the procedures were completed as described by an appropriately certified professional medical provider.  The particular CPT codes in question include, but are not necessarily limited to CPT codes 93600, 93602, 93603, 93609, 93610, 93612, 93613, 93615, 93616, 93618, 93619, 93620, 93621, 93622, 93623, 93624, 93631, 93640, 93641, 93642, 93650, 93653, 93654, 93655, 93656, 93657, 93660, and 93662.

27.     McDaniel directly observed the conduct of Dr. Marrouche, Zarkou and Fotheringham on hundreds of occasions while employed in the Holding Room.  About 15 procedures were conducted per week, and of these, at least two per week were not supervised as represented.  As noted, indirect but reliable reports of such conduct from McDaniel's coworkers reflected that the conduct predated her employment.  Moreover, continuing reports from other coworkers indicate that the conduct continued after she departed and may continue to this day.

28.     The defendants had actual and constructive knowledge that Dr. Marrouche's participation was being mischarted and misbilled.  Nonetheless, the EP Lab billed Medicare for

11

payment under the above-referenced CPT codes, thereby certifying that the services had been rendered pursuant to the CPT code description.

29.    Based upon these CPT codes and the submission of the request for payments to Medicare and Medicaid, which constituted a certification of full compliance with the CPT code descriptions, Medicare and Medicaid reasonably relied on the defendants' representations and paid the full amounts consistent with the CPT codes.

30.    At no time did the defendants disclose to Medicare or Medicaid that Dr. Marrouche did not supervise and/or attend the procedures for which the EP Lab billed as if he did so supervise and/or attend.

31.    The submission of requests for payment constituted false representations and claims made by the defendants.

32.    Prior to and in conjunction with the filing of this complaint, Relator McDaniel has complied with the disclosure provisions of 31 U.S.C. §3730(b)(2).

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

(False Claims Act – Presentation of False Claims)
(31 U.S.C. § 3729 (a)(1))

33.     All other paragraphs of this Complaint are re-alleged and incorporated as though fully set forth herein.

34.     As described above, the defendants personally and knowingly (*i.e.*, with actual notice, in deliberate ignorance of the truth and/or with reckless disregard of the truth) presented or caused to be presented materially false and/or fraudulent claims for payment or approval to the United States.

35.     By virtue of said false or fraudulent claims, the United States suffered damages.

36.     The damages include all amounts paid to defendants under the afore-described claims to which defendants were not legally entitled, amounts to be determined at trial.

### SECOND CAUSE OF ACTION
(False Claims Act – Making or Using False Record or Statement to Cause Claim to be Paid)
(31 U.S.C. § 3729 (a)(2))

37.     All other paragraphs of this Complaint are re-alleged and incorporated as though fully set forth herein.

38.     As described above, the defendants personally and knowingly (i.e., with actual knowledge in deliberate ignorance of the truth, and/or with reckless disregard of the truth) made or used, or caused to be made or used, materially false records or statements in order to obtain payment or approval by the United States of false or fraudulent claims.

39.     By virtue of said false or fraudulent documents, the United States suffered damages.

40.     The damages include all amounts paid to defendants under the afore-described claims to which defendants were not legally entitled, amounts to be determined at trial.

## THIRD CAUSE OF ACTION
(Utah False Claims Act § 26-20-1, *et seq.*)

41.     All allegations contained in this Complaint are incorporated herein as though fully set forth herein.

42.     Defendants and each of them made caused, agreed, combined and/or conspired to make a false statement and/or false representations of the material fact when applying to the State of Utah for medical benefits and/or for use in determining the right to medical benefits.  Said false statements or representations of a material fact included representations that medical services were performed by defendants which services were not fully rendered and/or related to items, including reports reflecting treatment which was not rendered.

43.     Defendants and each of them knowingly, intentionally, and/or recklessly made and sought to induce the State of Utah into paying defendants benefits under Title X of the Federal Public Health Services Act and/or a program for medical assistance from the State of Utah.

44.     Said application and claim for benefits were made with the intent that the State of Utah would rely upon said misrepresentations as being true, as a means to obtain benefits and money from the State of Utah and included, among other means, Medicare Participating Physician or Supplier Agreements.

45.     Defendants and each of them aided and abetted in the process of applying for and obtaining benefits from the State of Utah.

46.     Defendants and each of them had actual knowledge of the false statements and/or representations, or acted in deliberate ignorance of the truth or falsity of the information, or acted in reckless disregard of the truth or falsity of the information.

47.     As the result of the application for benefits based on false statements and representations, and reliance thereon, the State of Utah made payments to defendants, for which each of the defendants benefitted.

48.     As a result, defendants are liable for full and complete restitution, the costs of enforcement including, but not limited to, the cost of investigation, attorneys' fees and other related expenses, that all such damages be trebled, but in no event not less than $5,000 or more than $10,000 for each act done in violation of the Utah False Claims Act, together with all other penalties and recoverable damages.

## PRAYER FOR RELIEF

WHEREFORE, Relator McDaniel, on behalf of herself individually and acting on behalf of, and in the name of the United States, respectively, prays that relief be granted as follows:

1.     That judgment be entered against defendants in the amount of the damages sustained by the United States;

2.     That judgment be entered against defendants in the amount of three times the amount of damages the United States has sustained because of defendant's actions;

3.     That judgment be entered against defendants for a civil penalty of $11,000 for each act in violation of the False Claims Act, as adjusted per regulation;

4.     That judgment be entered against defendants for full and complete restitution, the costs of enforcement including, but not limited to, the cost of investigation,

attorneys' fees and other related expenses, that all such damages be trebled, but in no event not less than $5,000 or more than $10,000 for each violation of the Utah False Claims Act, together with all other penalties and recoverable damages.

5.      That Relator McDaniel be awarded the maximum amount available under 31 U.S.C. § 3730(d) for bringing this action, namely, 25 percent of the proceeds of the action or settlement of the claim if the intervenes in the matter (or pursues its claims through any alternative remedy available to the United States), or, alternatively, 30 percent of the proceeds of the action or settlement of the claim, if the United States declines to intervene;

6.      That Relator McDaniel be awarded all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorney fees and costs, as provided by 31 U.S.C. § 3730(d); and

7.      That the Court award all other appropriate equitable relief deemed just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY.

DATED this 15th day of January, 2015.

CHRISTENSEN & JENSEN, P.C.

Karra J. Porter
Phillip E. Lowry
*Attorneys for Plaintiff*